# United States Tax Court

CORRECTED
T.C. Memo. 2025-68

ANAHEIM ARENA MANAGEMENT, LLC, H&S INVESTMENTS I,
LP, A PARTNER OTHER THAN THE TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 16724-19.                                   Filed June 30, 2025.

————

*Steve Ray Mather*, for petitioner.

*Kevin W. Coy*, *Hans Famularo*, *Heather K. McCluskey*, and *Michelle A. Monroy*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 3

FINDINGS OF FACT ......................................................................... 3

I.   The Samueli entities .................................................................. 4

II.  The Honda Center; the management agreement ........................... 4

III. Deloitte's financial statements and AUP reports for the Honda Center's business activities; the financial performance of the Honda Center business activities from 2004–16 ...................................................................................... 16

IV.  AAM's advances to fund the Honda Center's business activities .................................................................................. 22

    A.   The promissory notes and "Request for Advance" forms ....... 22

**[*2]** B. AAM's advances ................................................................ 26

V. Bolar and Bellew's advice on whether AAM could claim a bad-debt deduction; AAM's claim of a bad-debt deduction ........... 33

VI. IRS audit and determination; the FPAA ...................................... 35

OPINION ............................................................................................ 37

I. AAM cannot deduct its advances as a bad debts because the advances are not debts. ................................................................ 41

    A. Names ...................................................................................... 44

    B. Maturity date ........................................................................ 46

    C. Source of payments ................................................................ 47

    D. Right to enforce repayment .................................................. 47

    E. Participation and management .............................................. 48

    F. Status equal to or inferior to other creditors ....................... 48

    G. The parties' intent ................................................................ 50

    H. "Thin" or adequate capitalization ........................................ 51

    I. Identity of interest ................................................................ 51

    J. Payment of interest only out of "dividend" money ................ 52

    K. The ability to obtain loans from outside lenders on substantially similar terms ................................................... 53

    L. Conclusion ............................................................................. 53

II. An accuracy-related penalty is not applicable to AAM's claim of a bad-debt deduction because AAM had reasonable cause for and acted in good faith in claiming the bad-debt deduction. ......................................................................................... 53

    A. The IRS satisfied section 6751(b)(1). .................................... 56

**[*3]**   1.   If Senior Counsel Coy made the IRS's initial determination to assert the penalty, his determination was approved by his supervisor. .................................... 56

2.   If Senior Counsel Coy did not make the initial determination to assert the penalty, the initial determination was made by RA Swann and approved by his supervisor. ............................................ 57

B.   AAM had reasonable cause and acted in good faith because Schulman reasonably relied on the advice of Bolar and Bellew when claiming AAM's bad-debt deduction. ............................................................... 58

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: This is a TEFRA[1] partnership-level proceeding brought under section 6226(b).[2] We have jurisdiction under section 6226(f). The Internal Revenue Service (IRS or respondent) issued a Notice of Final Partnership Administrative Adjustment (FPAA) to H&S Investments I, LP (H&S Investments), which is a member of Anaheim Arena Management, LLC (AAM). The FPAA disallowed a $51,465,228 bad-debt deduction AAM claimed on its tax return for the year ended December 31, 2015, and determined a section 6662(a) accuracy-related penalty, related to the bad-debt deduction, under section 6662(b)(1) or (2). We sustain the IRS's disallowance of the bad-debt deduction, but we do not sustain the section 6662(a) accuracy-related penalty.

FINDINGS OF FACT

The parties' stipulations of fact are incorporated herein by this reference.

---

[1] Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71.

[2] Unless otherwise indicated, references to sections to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[\*4]** I.    *The Samueli entities*

Henry Samueli and his family own the following five business entities, which operated in or near Orange County, California: AAM; H&S Investments; H&S Management, LP (H&S Management); H&S Ventures, LLC (H&S Ventures); and HS Portfolio, LP (HS Portfolio). When referring to the five entities collectively, we will call them the Samueli entities.

AAM is a limited liability company organized under California law. It is treated as a partnership for federal income tax purposes.

From December 31, 2003, through June 30, 2011, the members of AAM and their ownership percentages were (1) H&S Investments (80%), (2) H&S Management (10%), and (3) H&S Ventures (10%). From July 1, 2011, through December 31, 2015, the members of AAM and their ownership percentages were (1) H&S Investments (55%) and (2) HS Portfolio (45%).

II.    *The Honda Center; the management agreement*

The Honda Center is a sports-and-entertainment arena in Anaheim, California.[3]

On December 16, 2003, AAM and the City of Anaheim (City) entered into a facility management agreement (management agreement) granting AAM the exclusive license to manage the Honda Center on behalf of the City.

The pertinent provisions of the management agreement are reproduced below:[4]

> 1. *Exclusive License to Operate.* Effective on the Effective Date, Owner [defined as the City] grants Manager [defined as AAM], and Manager accepts, (a) an exclusive license to operate the Facility [i.e., the Honda Center] on the terms set forth in this Agreement and (b) an

---

[3] The arena was known as the "Arrowhead Pond of Anaheim" before its name was changed to the Honda Center. The name change occurred between July 1, 2006, and June 30, 2007.

[4] All capitalized terms in the provisions below are terms defined by the management agreement. We have included in this Opinion only those definitions necessary to our conclusions.

[*5] exclusive right consistent, except as otherwise expressly stated in Sections 3 and 4 below, with the usual and customary arena industry business practices of other major sports and entertainment facilities in the United States owned or managed by private-sector entities (or their affiliates), to purchase, create, produce, self-promote, co-promote, coordinate and stage for the benefit of Manager and Owner all acts and events to be held at the Facility, in accordance with this Agreement . . . .

2. *Term.*

2.1 *Base Term.* The term of this Agreement (the "Term") . . . continues in effect to and including June 30, 2023 (the "Base Term") . . . .

. . . .

2.3 *Effect of Termination.*

(a) On termination of this Agreement, Manager shall promptly deliver to Owner possession and control of the Facility and all Personal Property[5] (or comparable property, in substitution for the Personal Property) in Acceptable Condition,[6] and copies of any and all records in its custody relating to the Facility or to operations under this Agreement.

(b) In addition, on termination of this Agreement:

---

[5] The management agreement defined "Personal Property" as the equipment, furniture, and fixtures of the Honda Center.

[6] The management agreement defined "Acceptable Condition" as

a condition no worse than that existing on the Effective Date, reasonable wear and tear excepted, and at least comparable to the standards of maintenance and level of service existing at the Anaheim Convention Center and Edison International Field of Anaheim (making allowances for differences in age and disregarding for purposes of determining Manager's compliance with this standard the effect of any major renovations or retrofitting of such other facilities) but giving effect to ongoing Maintenance and Repairs in accordance with this Agreement (including capital expenditures in accordance with the Annual Budget).

**[*6]**       (i) *Surrender of Funds.* Manager shall surrender control of the Operating Account, the Reserve Account, the Insurance and Condemnation Account and the Third Party Funds Account and all funds therein . . . .

(ii) *Repayment of Operating Loans.* Manager shall be entitled to receive from Owner repayment of the outstanding balance (unpaid principal and accrued interest) of all Operating Loans, if any, existing as of the termination date after application of the funds described in Section 2.3(b)(i); *provided that* such Operating Loan balances shall be paid solely from Adjusted Net Revenues (excluding from the definition of "Adjusted Net Revenues" for this purpose the reference to amounts paid pursuant to Section 5.2(b)(viii)) from time to time as they become available therefor, and any such balance due shall be carried until paid in full; *provided further that* if repayment in full of such balance is not made on the termination date, such outstanding balance shall bear interest at a rate of Prime plus 1% per annum, payable at the end of each calendar month in arrears solely from Adjusted Net Revenues (excluding from the definition of "Adjusted Net Revenues" for this purpose the reference to amounts paid pursuant to Section 5.2(b)(viii)), until paid in full; and *provided further that* if the termination is the result of Owner's exercise of remedies following a Manager Event of Default . . . , any Operating Loan balances otherwise payable as provided in this Section 2.3 are subject to offset for Owner's damages, if any . . . .

. . . .

(c) Upon termination of this Agreement, if the Net Working Capital balance for the Facility is a negative number as of the termination date, Manager shall restore such Net Working Capital balance to zero by depositing to the Operating Account an amount equal to the amount of such negative Net Working Capital balance . . . .

3. *Manager's Duties.* Manager has the exclusive right and responsibility to manage and operate all aspects of the Facility subject to all terms and conditions of this Agreement. Without limiting the generality of the

**[*7]**    foregoing, but subject to the limitations set forth in Section 4 below, Manager shall do, and shall have the right to do, the following, in each case in accordance with usual and customary arena industry practices consistent with those of other major sports and entertainment facilities of similar age, size and facilities:

(a) enter into agreements for purchasing, booking, promotion, coordination, and staging of all acts and events to be held at the Facility, subject to the reserved rights of Owner as described in Section 4 below;

(b) establish, maintain and administer all funds and accounts as provided in this Agreement;

. . . .

(e) maintain the Facility and the level of service provided in Acceptable Condition, including all Maintenance and Repairs;

. . . .

**[*8]**      (g) pay when due (on a cash basis) all Operating Expenses,[7] all Debt Service[8] . . . and the Contingent

---

[7] The management agreement defined "Operating Expenses" as:

collectively, on a cash basis, for any period, all expenses of equipment leases; expenses of licensing, operating, maintaining, repairing and replacing portions of the Arena and of maintaining and operating the Parking Areas, including (but not limited to) utilities, costs of insurance, wages of employees of the Facility and related payroll expense and all costs of entering into service and other contracts as contemplated by this Agreement; costs of materials and supplies; talent expense; advertising and promotional cost and other direct expenses; amounts actually paid to or held back by the operator under the Food and Beverage Concessions Contract (if included in Gross Revenues); amounts paid to vendors from Severable Improvement Revenues . . . ; without duplication, payments made during such period, or deposits made during such period to the Reserve Account as reasonable Reserves, for Maintenance and Repairs; . . . costs of third party claims relating to use and operation of the Facility and not covered by insurance; amounts paid over from the Operating Account to the Insurance and Condemnation Account; all charges, assessments, fees and taxes which may now or at any future time be imposed by any governmental body having jurisdiction on the uses and operation of the Facility provided for in this Agreement or on Owner's interest in the Facility (including any possessory interest of Manager under this Agreement); legal and other professional fees incurred in the ordinary course of operation of the Facility not specifically excluded below; . . . and the Guaranteed Waiver and Consent Fee payable to the *Equity Investor* pursuant to the Waiver and Consent Agreement; *but specifically excluding* . . . (iii) interest and principal payments on Operating Loans, Other Debt, [and] Debt Service Loans . . . ; (iv) 2003 Facility Financing Debt Service; (v) Capital Expenditures (except as otherwise provided above in this definition of "Operating Expenses"); (vi) amounts expended from the Reserve Account for Maintenance and Repairs; [and] (vii) amounts paid out from the Third Party Funds Account . . . .

[8] The management agreement defined "Debt Service" as "collectively, the 2003 Facility Financing Debt Service and any Other Debt Service." The management agreement defined the "2003 Facility Financing Debt Service" as principal and interest due in an operating year on the "2003 Facility Financing." The "2003 Facility Financing" was defined by the management agreement as including the "issuance by the Anaheim Public Financing Authority of its Taxable Lease Revenue Bonds [Anaheim Arena Financing Project] Series 2003." Copies of these "Bonds" are not in the record. The management agreement defined "Other Debt Service" to include "all amounts of principal and interest due . . . on Other Debt." "Other Debt" was defined as "debt incurred in order to finance Additions."

**[*9]** Waiver and Consent Fee,[9] all as provided in Section 5.2(b), *provided that*: (i) in the event that cash on hand in the Operating Account and, as applicable, the Reserve Account is insufficient to pay Operating Expenses and any other amount payable pursuant to Section 5.2(b)(i), 5.2(b)(v), 5.2(b)(vi), 5.2(b)(viii), or 5.2(b)(xi), Manager shall make, or cause an Affiliate or a third party lending institution to make, Operating Loans for such purposes, (ii) in the event that cash on hand in the Operating Account and, as applicable, the Reserve Account, is insufficient to pay Debt Service, Manager shall make, or cause an Affiliate or a third party lending institution to make, Debt Service Loans for such purposes . . . ;

. . . .

(k) hire such employees or contract with others for provision of services necessary or desirable for all operations of the Facility which are the responsibility of Manager under this Agreement . . . ; Manager and Owner agree that in no event will the employees and other personnel at the Facility be considered employees of the City of Anaheim;

. . . .

(x) cause an Annual Budget to be prepared . . . .

. . . .

4. *Matters Requiring Owner Consent.* Notwithstanding the powers of Manager described in Section 3 above, the consent of Owner . . . shall be required prior to Manager entering into any binding agreement relating to the following:

. . . .

---

[9] The Contingent Waiver and Consent Fee was to be paid until January 2, 2019, and equaled "30% of all facility net revenues for each year ended June 30 in excess of the first $7,100,000, but not to exceed the sum of $600,000, plus a carryover amount of up to $600,000 for each such year."

**[\*10]**      (d) making any Capital Expenditure[10] not described in an Annual Budget;

. . . .

5. *Handling of Funds; Accounting, and Payment of Expenses.*

5.1 *Handling of Funds.*

(a) All funds received or held by Manager in connection with the operation and management of the Facility are subject to this agreement and, as applicable, the Financing Pledges.

(b) All funds received (including Advance Deposits) by Manager in connection with operation of the Facility shall be deposited promptly by Manager in accounts held and controlled by Manager for the benefit of Owner in accordance with this Agreement . . . all in accordance with the following:

(i) All funds other than Advance Deposits, Insurance and Condemnation Proceeds and Reserves shall be held in an account designated as the "Operating Account" (the "Operating Account").

(ii) All Advance Deposits shall be held in a segregated Third Party Funds Account. Amounts held in the Third Party Funds Account for disbursement to third parties shall be paid from the Third Party Funds Account to the Persons entitled to the same as and when the same become due pursuant to the specific contract related thereto. Any amounts held in the Third Party Funds Account which are not owed to third parties shall be transferred to the Operating Account at the time the related revenue is recognized in accordance with generally accepted accounting principles. Advance Deposits held in

---

[10] The management agreement defined "Capital Expenditure" as "expenditures for property, components, systems and structures with a useful life of not less than three (3) years or which extend the life of the structure or improvement into which incorporated by not less than three (3) years, having a unit cost of not less than $10,000."

**[\*11]** the Third Party Funds Account which are required to be refunded pursuant to the specific contract under which such Advance Deposit was made or which otherwise become refundable in accordance with industry custom and practice shall be refunded to the Persons entitled to the same.

(iii) All Insurance and Condemnation Proceeds shall be held in a segregated account designated as the "Insurance and Condemnation Account" (the "Insurance and Condemnation Account") pending application thereof as provided in this Agreement. Amounts in the Insurance and Condemnation Account shall be used to rebuild, repair, replace and/or reconstruct the Facility . . . . In the event that there are excess Insurance and Condemnation Proceeds after completion of the related rebuilding, repair, replacement or reconstruction, such Insurance and Condemnation Proceeds shall be transferred to the Operating Account. . . .

(iv) Reserves shall be held in a segregated account designated the "Reserve Account" (the "Reserve Account") pending application thereof as provided in this Agreement. Amounts held in the Reserve Account shall be used to pay costs for which such funds were reserved, including, as applicable, for Maintenance and Repairs as and when needed (including Capital Expenditures) and for Operating Expenses.

(c) Manager shall have the right to invest cash on hand in Permitted Investments[11] from time to time, subject to the requirements of the LILO Sublease and the 2003 Facility Financing Documents.

---

[11] The management agreement defined "Permitted Investments" to include "direct obligations of the United States of America and agencies guaranteed by the United States government having a final maturity of one year or less from the date of purchase thereof" and short-term investments in entities with the highest credit rating from Moody's or Standard & Poor's.

**[*12]**     5.2 *Payment of Expenses and Other Amounts.*

(a) All Gross Revenues[12] and proceeds of Operating Loans, Debt Service Loans . . . and Other Debt under this Agreement are the property of Owner . . . and during the Term . . . Owner grants Manager the power and authority, and hereby directs the Manager, to collect, deposit and distribute Gross Revenues and proceeds of Operating Loans, Debt Service Loans . . . and Other Debt in strict accordance with the terms of this Agreement. . . .

(b) From time to time during the Term, Manager shall pay amounts as and when specified below during each Operating Year from and to the extent of cash available . . . in the following order of priority:

(i) First, as and when due, payment of Operating Expenses;

---

12 The management agreement defined "Gross Revenues" as:

collectively, on a cash basis, for any period, any and all payments, fees and deposits of every nature received by Manager or Owner (including from any revenue streams not presently contemplated by this Agreement) for use of the Facility or services at or in respect of rights granted by the Facility, including revenues derived under the Food and Beverage Concessions Contract; . . . Marquee Revenues; promotion revenues; rent; advertising revenues; ticket agent rebates; signage revenues; payments from the Insurance and Condemnation Account to the Operating Account; Severable Improvement Revenues; parking fees or taxes of any kind; facility fees or taxes of any kind; ticket fees or taxes of any kind; vendor refunds; membership fees; sponsorship (including, if applicable, marquee-related) and licensing fees; premium seating fees; proceeds from the sale of programs, novelties; . . . all funds received from any other source in connection with events held at the Facility including rebates or rights fees paid by third parties to the extent attributable to operations at the Facility directly or indirectly and allocated in a manner which equitably compensates the Facility for its proportionate contribution to such rebates or rights fees; and all funds expressly identified in this Agreement as constituting Gross Revenues; *but specifically excluding* . . . proceeds of Operating Loans, Debt Service Loans . . . and Other Debt; and . . . earnings on Permitted Investments.

**[*13]**  (ii) Second, on each Distribution Date . . . payment to the *Equity Investor*[13] of the Contingent Waiver and Consent Fee then due;

(iii) Third, as and when due, payment of amounts for any LILO Claims pro rata according to the total due each to the *Equity Investor*, the *Trustee*,[14] [and] the *Equity Investor Guarantor*[15] . . . ;

(iv) Fourth, as and when due, payment of amounts for any LILO Claims pro rata according to the total due each to the *Debt Payment Undertaker*[16] and the *Debt Payment Undertaker Guarantor*[17] . . . ;

(v) Fifth, as and when due, payment of items in the Annual Budget for such Operating Year not described in any other provision of this Section 5.2(b);

(vi) Sixth, as and when due, payment of principal of and interest on Other Debt;

(vii) Seventh, as and when due, payment of 2003 Facility Financing Debt Service;

(viii) Eighth, payment of interest accrued on, and repayment of the principal amount of, Operating Loans;

(ix) Ninth, payment of principal of and interest on Debt Service Loans . . . due for such Operating Year;

---

[13] The management agreement defined "Equity Investor" as Bankers Commercial Corp.

[14] The management agreement defined "Trustee" as U.S. Bank National Association.

[15] The management agreement defined "Equity Investor Guarantor" as UnionBanCal Corp.

[16] The management agreement defined "Debt Payment Undertaker" as "American International Group, Inc. (AIG)-FP Special Finance (Cayman) Ltd."

[17] The management agreement defined "Debt Payment Undertaker Guarantor" as AIG.

**[\*14]**         (x) Tenth, payment of amounts then due to the issuer of the letter of credit pursuant to the Reimbursement Agreement;[18] and

(xi) Eleventh, on each Distribution Date . . . payment to Manager, Owner and County of Orange of their respective shares of Adjusted Net Revenues for the Operating Year just ended (the "Respective Shares"), determined as follows . . . :

(A) For any Operating Year through the end of the Base Term, the Respective Shares shall be determined as follows:

(1) First, the Manager shall be entitled to an amount of Adjusted Net Revenues which, when added to the amounts paid for such Operating Year pursuant to Sections 5.2(b)(ii), 5.2(b)(iii), 5.2(b)(iv), 5.2(b)(vii), 5.2(b)(ix) and 5.2(b)(x) (without any duplication of amounts thereunder), equals $12,000,000; and

(2) Manager, Owner and County of Orange shall share in all Adjusted Net Revenues (if any) in excess of $12,000,000 for such Operating Year as follows:

. . . .

(i) 5% to the County of Orange;

(ii) 20% to Owner; and

(iii) 75% to Manager;

. . . .

---

[18] The management agreement defined "Reimbursement Agreement" as "the *New Debt Reimbursement Agreement* as defined in the Glossary." The parties in our case stipulated that "'New Debt Reimbursement Agreement' means the Reimbursement Agreement dated as of December 16, 2003, between the City and Westdeutsche Landesbank." The parties stipulated that Exhibit 292-J is the "Letter of Credit Reimbursement Agreement."

**[*15]**     24. *Miscellaneous Provisions.*

24.1 *Relationship.* Owner is the sole and exclusive owner of the Facility. Nothing in this Agreement shall be construed to create a partnership or joint venture. Manager acknowledges that Manager has no possessory or property interest in the Facility, nor any interest in its business or assets, except for the interest of Manager in fees and profits strictly as described in this Agreement.

. . . .

29. *Special Obligation of Owner.* Notwithstanding anything to the contrary contained herein, the obligation of Owner to make any payment required by or resulting from this Agreement is a special obligation of Owner payable only from the Gross Revenues available therefor in accordance with the priority of payment set forth in Section 5.2(b) of this Agreement and not from any other funds or monies of Owner. The full faith and credit of Owner is not available for or pledged to any payment required by or resulting from this Agreement. The obligation of Owner to make any payment required by or resulting from this Agreement does not constitute an obligation of Owner for which it is obligated to levy or collect any form of taxation or for which Owner has levied or pledged any form of taxation or any of its property, assets, income, funds or monies other than the Gross Revenues available therefor in accordance with the priority of payment set forth in Section 5.2(b) of this Agreement.

The management agreement defined "Additions" as

any of the following: (a) an addition to the original major equipment and components of the Facility, (b) a change in the physical structure of the Facility that results in a material change in the uses, purpose or operations of the Facility, (c) a replacement of or addition to the scoreboard or audio and video capability of the Facility, or (d) any single Capital Expenditure required under a Long-Term Agreement whose cost is more than $50,000 (as adjusted by the CPI Adjustment).

[*16] The management agreement defined "Debt Service Loan" as

> a loan made by Manager, its affiliates or a third party lending institution, the proceeds of which are used to pay Debt Service; *provided that* any such loan made by Manager or its affiliates shall bear interest at an annual rate equal to Prime plus 1%.

The management agreement defined "Operating Loan" as

> a loan (other than a Debt Service Loan . . . ) made by Manager, its affiliates or a third party lending institution, the proceeds of which are used to pay Operating Expenses, interest or principal due under an Operating Loan and/or any other amount payable pursuant to Section 5.2(b) (including distributions of Adjusted Net Revenues) other than Debt Service . . . ; *provided that* any such loan made by Manager or its affiliates shall bear interest at an annual rate equal to Prime plus 1%.

The management agreement defined "Prime" as "the prime rate listed from time to time in *The Wall Street Journal*, which listing appears as of the date hereof under the caption 'Money Rates.'"

When the management agreement went into effect on December 16, 2003, AAM opened four bank accounts for the funds that it controlled and used for the Honda Center on behalf of the City. The four accounts were classified and governed by section 5.1(b) of the management agreement as (1) the Operating Account, (2) the Third-Party Funds Account, (3) the Insurance and Condemnation Account, and (4) the Reserve Account. At all times, the funds in the four bank accounts were the property of the City even though the accounts were opened and controlled by AAM.

III. *Deloitte's financial statements and AUP reports for the Honda Center's business activities; the financial performance of the Honda Center business activities from 2004–16*

Deloitte & Touche LLP (Deloitte) created (1) annual financial statements of the Honda Center's business activities, (2) combined annual financial statements of the Honda Center's business activities and AAM's business activities, and (3) Agreed-Upon Procedure (AUP) reports of the Honda Center's business activities. The AUP reports were created to ensure that AAM allocated the Honda Center's

[*17] revenues in accordance with section 5.2(b) of the management agreement.

The following table shows the financial performance of the Honda Center business activities for the fiscal years ended June 30, 2004–16, as reported in the AUP reports:

| Fiscal year ended June 30 | Gross revenues | Operating expenses | Net revenues | Earnings on permitted investments | Net revenues plus earnings on permitted investments |
|---|---|---|---|---|---|
| 2004 | $21,274,205 | $15,367,071 | $5,907,134 | $13,147 | $5,920,281 |
| 2005 | 27,225,036 | 26,767,530 | 457,506 | 164,277 | 621,783 |
| 2006 | 46,263,714 | 36,240,051 | 10,023,663 | 513,598 | 10,537,261 |
| 2007 | 54,280,064 | 42,821,860 | 11,458,204 | 820,184 | 12,278,388 |
| 2008 | 59,562,764 | 48,850,148 | 10,712,616 | 620,007 | 11,332,623 |
| 2009 | 59,939,129 | 47,125,649 | 12,813,480 | 211,520 | 13,025,000 |
| 2010 | 51,065,939 | 40,696,442 | 10,369,497 | 14,443 | 10,383,940 |
| 2011 | 51,733,170 | 43,284,434 | 8,448,736 | 17,534 | 8,466,270 |
| 2012 | 42,197,558 | 38,379,860 | 3,817,698 | 4,187 | 3,821,885 |
| 2013 | 41,462,672 | 43,071,617 | −1,608,945 | 3,240 | −1,605,705 |
| 2014 | 68,181,158 | 65,030,019 | 3,151,139 | 2,511 | 3,153,650 |
| 2015 | 79,953,080 | 73,999,331 | 5,953,749 | 594 | 5,954,343 |
| 2016 | 73,336,615 | 71,963,464 | 1,373,151 | -0- | 1,373,151 |

The table above reflects the following information.

Column 1 states the year-end date for the fiscal years ended June 30, 2004–16.

Column 2 states the gross revenues earned by the Honda Center's business activities for each fiscal year using the definition of "Gross Revenues" provided in the management agreement. *See supra* note 12.

Column 3 states the operating expenses incurred during each fiscal year using the definition of "Operating Expenses" provided in the management agreement. *See supra* note 7. The management agreement required AAM to pay the Honda Center's operating expenses first in the priority of payment in section 5.2(b) of the management agreement.

**[*18]** Column 4 states the Honda Center's net revenues for each fiscal year in accordance with the definition of "Net Revenues" in the management agreement. The management agreement defined "Net Revenues" as, "for any period, the positive number, if any, determined by computing Gross Revenues for such period minus Operating Expenses for such period." Thus, the amounts in column 4 are calculated by subtracting the operating expenses stated in column 3 from the gross revenues stated in column 2.

Column 5 states the "earnings on permitted investments" for each fiscal year in accordance with the definition of "Permitted Investments" in the management agreement. *See supra* note 11.

Finally, column 6 states the combined net revenues and earnings on permitted investments for each fiscal year. The amounts in column 6 are the sum of the net revenues stated in column 4 and the earnings on permitted investments stated in column 5. The amounts in column 6 were the amounts of revenue and earnings that AAM had left over from the Honda Center's business activities to make all of the payments for the Honda Center that are listed in section 5.2(b)(ii)–(x) of the management agreement. Any revenues left over after AAM made the required payments were divided between AAM, the City, and Orange County pursuant to section 5.2(b)(xi) of the management agreement.

The table below shows the "Contingent Waiver and Consent Fee" paid by AAM for the fiscal years ended June 30, 2004–16, as reported in the AUP reports.

| Fiscal year ended June 30 | Amount of payment |
|---|---|
| 2004 | $325,479 |
| 2005 | 0 |
| 2006 | 600,000 |
| 2007 | 600,000 |
| 2008 | 600,000 |
| 2009 | 600,000 |
| 2010 | 600,000 |
| 2011 | 404,621 |
| 2012 | 0 |
| 2013 | 0 |
| 2014 | 0 |
| 2015 | 0 |
| 2016 | 0 |

**[*19]** AAM paid all amounts owed for the Contingent Waiver and Consent Fee when due. For example, AAM paid $325,479 for the Contingent Waiver and Consent Fee for the fiscal year ended June 30, 2004. The $325,479 payment equaled the amount owed for the Contingent Waiver and Consent Fee for that fiscal year. Under section 5.2(b)(ii) of the management agreement, the Contingent Waiver and Consent Fee was second in the priority of payment.

Under section 5.2(b)(iii) of the management agreement, "amounts for any LILO Claims pro rata according to the total due each to the *Equity Investor*, the *Trustee*, [and] the *Equity Investor Guarantor*" were third in the priority of payment. During the fiscal years ended June 30, 2004–16, AAM did not make any payment pursuant to section 5.2(b)(iii) of the management agreement because no payment was ever owed under that provision of the management agreement.

Under section 5.2(b)(iv) of the management agreement, "amounts for any LILO Claims pro rata according to the total due each to the *Debt Payment Undertaker* and the *Debt Payment Undertaker Guarantor*" were fourth in the priority of payment. During the fiscal years ended June 30, 2004–16, AAM did not make any payment pursuant to section 5.2(b)(iv) of the management agreement because no payment was ever owed under that provision of the management agreement.

The table below shows the amounts owed under section 5.2(b)(v) of the management agreement for "items in the Annual Budget for such Operating Year not described in any other provision of this Section 5.2(b)" during the fiscal years ended June 30, 2004–16, as reported in the AUP reports:

**[*20]**

| Fiscal year ended June 30 | Amount of expenses |
|---|---|
| 2004 | $1,365,887 |
| 2005 | 1,395,339 |
| 2006 | 4,063,028 |
| 2007 | 7,802,322 |
| 2008 | 1,441,537 |
| 2009 | 1,455,340 |
| 2010 | 1,962,052 |
| 2011 | 2,967,867 |
| 2012 | 1,422,752 |
| 2013 | 3,767,678 |
| 2014 | 7,071,161 |
| 2015 | 3,427,039 |
| 2016 | 2,339,199 |

Beginning with the fiscal year ended June 30, 2005, AAM paid all amounts owed under section 5.2(b)(v) of the management agreement when due. For example, AAM paid $1,395,339 under section 5.2(b)(v) of the management agreement for the fiscal year ended June 30, 2005. The $1,395,339 payment equaled the amount owed under section 5.2(b)(v) of the management agreement during that fiscal year. However, as indicated by the AUP report for fiscal year ended June 30, 2004, of the $1,365,887 amount owed for that fiscal year, only $956,627 was paid (leaving $409,260 unpaid).

Under section 5.2(b)(v) of the management agreement, the amounts in the table above were paid fifth in the priority of payment.

The table below shows the required payments for the "2003 Facility Financing Debt Service" during the fiscal years ended June 30, 2004–16, as reported in (1) the AUP reports, (2) the annual financial statements for the Honda Center's business activities, or (3) the combined annual financial statements for the Honda Center's business activities and AAM.[19]

---

[19] The AUP reports do not state the amounts paid by AAM for the 2003 Facility Financing Debt Service during either the fiscal year ended June 30, 2005, or the fiscal year ended June 30, 2016. Our determination of the amounts paid by AAM during those two fiscal years is based on the annual financial statements for the Honda Center's business activities and the combined annual financial statements for the Honda Center's business activities and AAM, which are the only information in the record showing those amounts.

**[*21]**

| Fiscal year ended June 30 | Amount of payment |
|---|---|
| 2004 | $3,134,560 |
| 2005 | 5,055,049 |
| 2006 | 5,514,190 |
| 2007 | 5,433,433 |
| 2008 | 5,356,733 |
| 2009 | 5,279,622 |
| 2010 | 5,680,509 |
| 2011 | 5,531,835 |
| 2012 | 5,383,161 |
| 2013 | 5,234,487 |
| 2014 | 5,585,513 |
| 2015 | 5,368,915 |
| 2016 | 5,652,009 |

AAM paid all amounts owed for the 2003 Facility Financing Debt Service when due. For example, AAM paid $3,134,560 for the 2003 Facility Financing Debt Service for the fiscal year ended June 30, 2004. The $3,134,560 payment equaled the amount owed for the 2003 Facility Financing Debt Service during that fiscal year. Under section 5.2(b)(vii) of the management agreement, payments for the 2003 Facility Financing Debt Service were seventh in the priority of payment.

Under section 5.2(b)(x) of the management agreement, "amounts then due to the issuer of the letter of credit pursuant to the Reimbursement Agreement" were tenth in the priority of payment. During the fiscal years ended June 30, 2004–16, AAM did not make any payment pursuant to section 5.2(b)(x) of the management agreement because no payment was ever owed under that provision of the management agreement.

Under section 5.2(b)(xi)(A)(1) of the management agreement, AAM was to receive "an amount of Adjusted Net Revenues which, when added to the amounts paid for such Operating Year pursuant to Sections 5.2(b)(ii), 5.2(b)(iii), 5.2(b)(iv), 5.2(b)(vii), 5.2(b)(ix) and 5.2(b)(x) (without any duplication of amounts thereunder), equals only $12,000,000." AAM was paid under section 5.2(b)(xi)(A)(1) of the management agreement for two fiscal years. For the fiscal year ended June 30, 2004, AAM received $1,163,271. For the fiscal year ended June 30, 2010, AAM received $879,731. The amounts AAM received under section 5.2(b)(xi)(A)(1) of the management agreement were equal to the amounts AAM was entitled to receive under that provision of the management agreement.

[*22] Under section 5.2(b)(xi)(A)(2) of the management agreement, AAM, the City, and Orange County were to divide the remaining net revenues from the Honda Center among themselves. AAM would receive 75% of any remaining net revenues, while the City and Orange County would receive 20% and 5%, respectively. AAM, the City, and Orange County were never paid during any fiscal year pursuant to section 5.2(b)(xi)(A)(2) of the management agreement because the Honda Center's business activities never earned sufficient revenue to trigger a payment under that provision of the management agreement.

IV.     *AAM's advances to fund the Honda Center's business activities*

While it was the manager of the Honda Center, AAM repeatedly made advances to remedy the Honda Center's shortfalls in funding. These advances were of three types. First, AAM made advances that were Operating Loans within the meaning of that term as defined in the management agreement. Second, AAM made advances that were Debt Service Loans within the meaning of that term as defined in the management agreement. Third, AAM made advances to fund capital expenditures for the Honda Center. We refer to the third type of advance as a Capital Expenditure Loan (Cap Ex Loan), a term that is not defined in the management agreement. Any references to AAM's advances as "Operating Loans," "Debt Service Loans," and "Cap Ex Loans" are to distinguish the different types of advances that AAM made while managing the Honda Center. This should not be read as a legal conclusion that AAM's advances are debt for tax purposes. In addition, we sometimes refer to "interest" that AAM received on its advances. This should not be read as a legal conclusion that the return AAM received on the advances qualifies as "interest" for tax purposes. For reasons discussed *infra* OPINION Part I, we conclude that none of the advances is debt.

A.     *The promissory notes and "Request for Advance" forms*

AAM documented its advances as follows.

First, AAM executed promissory notes, each of which named "AAM" as the lender and "the Honda Center" as the borrower. Timothy Ryan, AAM's chief executive officer and president, signed all of the notes on behalf of the Honda Center. Some of the notes were signed by AAM, too. These notes were signed on AAM's behalf by Michael Schulman, who was an officer of AAM and chair of H&S Ventures.

**[\*23]** Even though each note named "the Honda Center" as the purported borrower of the advances, the Honda Center is a physical asset of the City. It is not a distinct legal entity with the legal capacity to borrow money. Ryan, who signed all the notes on behalf of the Honda Center, was not (1) an employee of the City or (2) authorized to bind the City to the terms of the notes. Therefore, AAM could sue neither the City nor "the Honda Center" to seek repayment under the terms of the notes. AAM could enforce repayment of its advances only under the terms of the management agreement. Under the management agreement, the City is the recipient of AAM's advances.[20] For simplicity, however, we will refer to the Honda Center as the borrower in our discussion of the notes in this section of the Opinion because that is the purported borrower named in the notes.

Each note specified the maximum amount that the Honda Center could owe at any specific point in time as to various types of advances. For example, the first note, dated July 1, 2004, stated that the Honda Center could owe up to $8 million as to all three types of advances. Thus, under the terms of the note dated July 1, 2004, the Honda Center could borrow up to $8 million in total advances from AAM.

When the advances from AAM reached the maximum amount allowed under the then-current note, a new note or an amendment to the prior note increased the maximum amount allowed. For example, the note dated July 1, 2012, allowed the Honda Center to receive up to $17 million in total advances as to all three types of advances. On December 1, 2012, AAM and Ryan, on behalf of the Honda Center, amended the note to increase the maximum amount allowed to $32 million.

Beginning on July 1, 2014, the notes separated the types of advances as follows. One note documented the Operating Loans and the Debt Service Loans. The second note documented the Cap Ex Loans. For example, there were two notes dated September 30, 2014. The first note

---

[20] Although AAM does have control of the bank accounts for the Honda Center's business activities, section 5.1(b) of the management agreement provides that AAM is operating and controlling the accounts "for the benefit of [the City]." Furthermore, section 5.2(a) of the management agreement provides that "[a]ll Gross Revenues and proceeds of Operating Loans, Debt Service Loans, . . . and Other Debt under this agreement are the property of [the City]." Thus, when AAM transferred the funds that it received from its members to the bank accounts that AAM used for the Honda Center's business activities, the funds in that account became the property of the City. Under the terms of the management agreement, the City is the recipient of AAM's advances.

**[*24]** dated September 30, 2014, stated that the Operating Loans and the Debt Service Loans could have a combined maximum outstanding balance of $35 million. The second note dated September 30, 2014, stated that the Cap Ex Loans could have a maximum outstanding balance of $11,100,000.

Each note stated that the interest rate on each advance made with respect to the note was equal to the prime rate plus 1%.

The notes stated that the Operating Loans and the Debt Service Loans had a maturity date one year from the date of the note. In actual practice, however, AAM treated the Operating Loans and the Debt Service Loans as a revolving line of credit that had no maturity date. Whenever the maturity date was reached, AAM would carry over the outstanding principal balance on the Operating Loans and the Debt Service Loans to a new note with a new maturity date. The notes stated that the entire principal balance on the Operating Loans and Debt Service was due on the maturity date, and no payments of principal were due before that date.

The maturity date for the Cap Ex Loans stated by the notes varied:

| Date of note or amendment to note | Beginning of maturity term | Length of maturity term |
|---|---|---|
| 7/1/06 | Borrowing request | Life of asset, but not less than 3 years or more than 5 years |
| 7/1/07 | Borrowing request | Life of asset, but not more than 4 years |
| 7/1/08 | Borrowing request | Life of asset, but not more than 4 years |
| 7/1/09 | Borrowing request | Life of asset, but not more than 4 years |
| 7/1/10 | Borrowing request | Life of asset, but not more than 4 years |
| 7/1/11 | Borrowing request | Life of asset, but not more than 4 years |
| 7/1/12 | Borrowing request | (1) Life of asset, but not more than 4 years, (2) 5 years for Grand Terrace |
| 6/26/13 | Borrowing request | (1) Life of asset, but not more than 4 years, (2) 5 years for Grand Terrace |
| 7/31/13 | Borrowing request | (1) Life of asset, but not more than 4 years, (2) 5 years for Grand Terrace |
| 9/30/14 | Date of note | 5 years |

**[*25]** The notes dated before June 30, 2015, stated that interest on all three types of advances was due on "the last Banking Day of each calendar quarter." The notes defined "Banking Day" as "any day on which commercial banks are not authorized or required to close in Los Angeles, California." The last note, which was dated June 30, 2015, and which related to Cap Ex Loans, stated that interest was due only on the maturity date of June 30, 2016.

The notes dated before September 30, 2014, stated that principal repayments for the Cap Ex Loans "based on the agreed upon amortization schedule" were due on "the last Banking Day of each calendar quarter" except for the first note, dated July 1, 2016, which required no principal payments on Cap Ex Loans before their maturity date. The note dated September 30, 2014, set forth an actual repayment schedule (with dates and amounts) of principal on the Cap Ex Loans. The first date on that schedule was June 30, 2016. Thus no principal payments were required at the end of the fourth quarter 2014, the first quarter 2015, the second quarter 2015, the third quarter 2015, the fourth quarter 2015, or the first quarter 2016.

All of the notes stated that

> [i]f . . . the Borrower shall fail to pay . . . interest . . . when due and payable . . . the lender may . . . declare the unpaid principal amount of this Note, accrued interest thereon and all other amounts payable under this Note due and payable whereupon the same shall be due and payable without presentment, demand, protest or further notice of any kind . . . .

In addition, all of the notes stated that any failure by the Honda Center to pay interest when due would be an "Event of Default." All of the notes further stated that in the Event of Default the "principal shall bear interest from and including the date of such Event of Default until paid in full at a rate per annum equal to the Default Rate, such interest to be payable on demand." All of the notes defined the "Default Rate" as "a rate per annum equal to a floating rate of 2% above the rate of interest otherwise payable." Because the notes stated that the interest rate for all advances was equal to the prime rate plus 1%, the Default Rate for all advances was equal to the prime rate plus 3%.

All of the notes stated that "[t]he [Honda Center] shall give [AAM] notice of each borrowing request in the form attached as Exhibit A."

[*26] Exhibit A of the Notes was a "Request for Advance" form. A "Request for Advance" form for each of AAM's advances was introduced into evidence. Each of the "Request for Advance" forms was signed by Ryan on behalf of the Honda Center.

Each "Request for Advance" form included the following information. First, the forms specified the amount of the requested advance. Second, the forms specified the type of advance that was being requested (i.e., an Operating Loan, a Debt Service Loan, or a Cap Ex Loan). Third, for only Cap Ex Loans, each "Request for Advance" form specified a maturity date. In particular, such forms specified that the maturity date was either four or five years. This was inconsistent with the notes, which stated that the maturity dates differed.

The "Request for Advance" forms did not include a maturity date for either the Operating Loans or the Debt Service Loans.

To pay the principal and interest on the advances, AAM, which managed the bank accounts used to fund the Honda Center's business activities on behalf of the City, would transfer the principal and interest payments from the accounts used for the Honda Center to AAM's own business account. All of the payments were documented by invoices (written by AAM to the "Honda Center") that stated (1) the type of advance, (2) whether only interest or both interest and principal were being paid, (3) the amount of the payment, and (4) wiring instructions for the payment. These invoices stated amortization schedules for the advances, including the Cap Ex Loans, thus stating due dates for repayment of principal on the Cap Ex Loans. We believe these amortization schedules in the invoices were "agreed upon amortization schedule[s]" referred to in the notes dated before September 30, 2014, related to CapEx Loans.

To make the advances to fund the Honda Center's business activities, AAM received advances from its members.

B.     *AAM's advances*

The table below shows AAM's Cap Ex Loans from 2011 to 2015:[21]

---

[21] AAM made an additional $3,500,000 Cap Ex Loan on July 13, 2006. This Cap Ex Loan was fully repaid by June 30, 2010. This means that the Cap Ex Loan made on July 13, 2006, is not reported by AAM as part of its bad-debt deduction for

**[*27]**

| Date of advance | Amount of Cap Ex Loan |
|---|---|
| 8/01/2011 | $2,500,000 |
| 8/01/2012 | 2,500,000 |
| 8/15/2012 | 2,500,000 |
| 12/03/2012 | 3,000,000 |
| 1/02/2013 | 2,000,000 |
| 1/10/2014 | 2,000,000 |
| 10/31/2014 | 900,000 |

The amounts in the table above are the amounts of Cap Ex Loans made by AAM without taking into account any principal payments that AAM received for the Cap Ex Loans. For example, AAM made a $2,500,000 Cap Ex Loan on August 1, 2011. AAM then made another $2,500,000 Cap Ex Loan on August 1, 2012.

The table below shows the interest received by AAM on the Cap Ex Loans:

| Payment date | Amount of interest |
|---|---|
| 9/30/2011 | $17,708 |
| 12/30/2011 | 25,275 |
| 3/30/2012 | 24,067 |
| 6/29/2012 | 22,847 |
| 9/28/2012 | 52,898 |
| 12/31/2012 | 80,791 |
| 3/19/2013 | 118,432 |
| 6/28/2013 | 112,551 |
| 9/30/2013 | 106,371 |
| 12/31/2013 | 100,126 |
| 3/31/2014 | 112,940 |
| 6/30/2014 | 107,706 |
| 9/30/2014 | 107,706 |
| 12/30/2014 | 115,384 |
| 3/31/2015 | 117,269 |
| 6/30/2015 | 118,571 |

---

2015. For simplicity, we have excluded this Cap Ex Loan from the table showing AAM's Cap Ex Loans.

[*28] The amounts shown in the table above as paid were equal to the interest owed on the Cap Ex Loans under the terms of the notes for each quarter. For example, under the terms of the notes, AAM was owed $17,708 of interest on the Cap Ex Loans for the quarter ending on September 30, 2011. As the table above shows, AAM was paid $17,708 of interest on the Cap Ex Loans on September 30, 2011. In total, AAM received all interest on the Cap Ex Loans when due through December 31, 2015.

The interest payments for the Cap Ex Loans were calculated using the prime rate plus 1% on the outstanding balance of the Cap Ex Loans.

The table below shows the principal payments received by AAM for the Cap Ex Loans:

| Payment date | Amount of principal payment |
| --- | --- |
| 9/30/2011 | $121,215 |
| 12/31/2011 | 113,649 |
| 3/30/2012 | 114,856 |
| 6/29/2012 | 116,076 |
| 9/28/2012 | 363,643 |
| 12/31/2012 | 501,832 |
| 3/29/2013 | 575,709 |
| 6/28/2013 | 581,589 |
| 9/30/2013 | 587,769 |
| 12/20/2013 | 594,014 |
| 3/31/2014 | 692,612 |

AAM did not receive any principal payments for the Cap Ex Loans after March 31, 2014. This was not within the meaning of a default of the notes for two reasons. First, AAM waived the required principal payment on the Cap Ex Loan due on June 30, 2014. Under the terms of the waiver, the principal payment for the Cap Ex Loans originally due for the quarter ending on June 30, 2014, was to be paid on September 30, 2014. Second, beginning with the note dated September 30, 2014, all principal payments for the Cap Ex Loans (including the principal payment due for the quarter ending on September 30, 2014) were paused until June 30, 2016.

The Cap Ex Loans were "Other Debt" in the management agreement. The principal and interest payments on the Cap Ex Loans

**[*29]** were sixth in the priority of payment in section 5.2(b) of the management agreement (i.e., section 5.2(b)(vi)).

The table below shows AAM's Operating Loans from November 17, 2004, to December 31, 2015:[22]

| Date of advance | Amount of Operating Loan |
|---|---|
| 11/17/2004 | $4,000,000 |
| 12/13/2004 | 1,600,000 |
| 5/16/2005 | 2,000,000 |
| 7/06/2005 | 1,000,000 |
| 10/05/2005 | 1,000,000 |
| 11/18/2005 | 2,500,000 |
| 12/20/2006 | 1,700,000 |
| 8/01/2012 | 1,000,000 |
| 1/02/2013 | 1,000,000 |
| 3/29/2013 | 1,000,000 |
| 6/24/2013 | 2,500,000 |
| 10/25/2013 | 1,500,000 |
| 3/19/2014 | 900,000 |
| 5/16/2014 | 1,100,000 |
| 7/09/2014 | 3,500,000 |
| 8/28/2014 | 1,600,000 |
| 10/01/2014 | 2,400,000 |
| 12/01/2014 | 2,000,000 |
| 5/26/2015 | 2,500,000 |
| 7/07/2015 | 1,500,000 |
| 10/01/2015 | 1,500,000 |
| 12/01/2015 | 1,500,000 |

The amounts in the table above are the amounts of Operating Loans made by AAM without taking into account any principal payments that AAM received for the Operating Loans. For example, AAM made a

---

[22] An additional $2 million Operating Loan was made on January 4, 2004. Nothing in the record specifies the exact repayment date for the $2 million Operating Loan made on January 4, 2004; however, the annual financial statements for the Honda Center's business activities report that this Operating Loan was fully repaid with interest during the fiscal year ended June 30, 2005. The Operating Loan made on January 4, 2004, was not reported by AAM as part of its bad-debt deduction for 2015. For simplicity, we have omitted this Operating Loan from the table showing AAM's Operating Loans.

[*30] $4 million Operating Loan on November 17, 2004. AAM then made another $1,600,000 Operating Loan on December 13, 2004.

The table below shows the interest received by AAM on the Operating Loans:

| Payment date | Amount of interest |
|---|---|
| 12/31/2006 | $1,727,640 |
| 3/30/2007 | 319,125 |
| 6/27/2007 | 322,671 |
| 9/27/2007 | 304,958 |
| 12/28/2007 | 283,201 |
| 3/31/2008 | 228,038 |
| 6/30/2008 | 180,054 |
| 9/30/2008 | 149,500 |
| 12/31/2008 | 126,073 |
| 4/01/2009 | 103,594 |
| 6/30/2009 | 101,439 |
| 9/30/2009 | 62,451 |
| 12/31/2009 | 62,451 |
| 3/31/2010 | 61,094 |
| 6/30/2010 | 61,773 |
| 9/30/2010 | 62,451 |
| 12/31/2010 | 62,451 |
| 3/31/2011 | 61,094 |
| 6/30/2011 | 61,773 |
| 9/30/2011 | 62,451 |
| 12/30/2011 | 62,451 |
| 3/31/2012 | 61,773 |
| 6/30/2012 | 61,773 |
| 9/30/2012 | 69,653 |
| 12/31/2012 | 73,313 |
| 3/31/2013 | 82,580 |
| 6/30/2013 | 95,271 |
| 9/30/2013 | 97,761 |
| 12/31/2013 | 109,803 |
| 3/31/2014 | 112,954 |
| 6/30/2014 | 128,455 |
| 9/30/2014 | 176,905 |
| 12/31/2014 | 224,553 |
| 3/31/2015 | 233,761 |
| 6/30/2015 | 246,983 |

**[*31]** As can be seen above, AAM was paid $1,727,640 of interest on the Operating Loans on December 31, 2006. Before December 31, 2006, AAM had not been paid interest on the Operating Loans even though, under the terms of the notes, interest should have been paid at the end of each quarter.

In addition, AAM was paid $103,594 of interest on April 1, 2009. As discussed *supra*, interest payments were due on the last banking day of each quarter. An interest payment was therefore due on March 31, 2009, which means that the April 1 payment was late.

The interest payments for the Operating Loans were calculated using the prime rate plus 1% on the outstanding balance of the Operating Loans. This was inconsistent with the terms of the notes. Because the required quarterly interest payments were not made before December 31, 2006, the Operating Loans were in default under the terms of the notes. The notes stated that, if the Operating Loans were in default, the interest on the outstanding balance of the Operating Loans would accrue at a rate equal to the prime rate plus 3% until AAM received full payment of the principal on the Operating Loans. Therefore, under the terms of the notes, AAM should have received more interest on the Operating Loans than it was paid.

The table below shows the principal payments received by AAM for the Operating Loans:

| Payment date | Amount of principal payment |
|---|---|
| 6/29/2007 | $800,000 |
| 12/31/2007 | 500,000 |
| 3/27/2008 | 750,000 |
| 6/30/2008 | 2,000,000 |
| 6/23/2009 | 4,000,000 |
| 6/28/2013 | 2,248,998 |

As can be seen in the table above, AAM received few principal payments for the Operating Loans. All but one of the principal payments occurred from June 29, 2007, to June 23, 2009. AAM did not receive any principal payments for the Operating Loans after the fiscal year ended June 30, 2013. Whenever there was insufficient revenue to pay the principal on the Operating Loans, AAM waived the required principal payment and carried over the outstanding principal balance on the Operating Loans to the next note.

[*32] The principal and interest payments for the Operating Loans were eighth in the priority of payment in section 5.2(b) of the management agreement (i.e., section 5.2(b)(viii)).

The table below shows AAM's Debt Service Loans from 2012 to 2015:[23]

| Date of advance | Amount of Debt Service Loan |
|---|---|
| 11/26/2012 | $1,867,244 |
| 5/20/2013 | 3,367,244 |
| 6/24/2013 | 2,943,138 |
| 10/01/2013 | 694,140 |
| 12/20/2013 | 694,140 |
| 3/28/2014 | 805,552 |

The table below shows the interest received by AAM on the Debt Service Loans:

| Payment date | Amount of interest |
|---|---|
| 12/31/2012 | $7,936 |
| 3/31/2013 | 19,839 |
| 6/30/2013 | 39,188 |
| 9/30/2013 | 88,818 |
| 12/31/2013 | 97,341 |
| 3/31/2014 | 102,018 |
| 6/30/2014 | 111,421 |
| 9/30/2014 | 112,646 |
| 12/31/2014 | 112,646 |
| 3/31/2015 | 110,197 |
| 6/30/2015 | 111,421 |

The amounts shown in the table above as paid were equal to the interest owed on the Debt Service Loans under the terms of the notes. For example, under the terms of the notes, AAM was owed $7,936 of interest on the Debt Service Loans for the quarter ending on December 31, 2012. As the table above shows, AAM was paid $7,936 of interest on the Debt Service Loans on December 31, 2012. In total, AAM received all required interest on the Debt Service Loans when due through December 31, 2015.

---

[23] AAM did not make any Debt Service Loans before November 26, 2012.

**[*33]** The interest payments for the Debt Service Loans were calculated using the prime rate plus 1% on the outstanding balance of the Debt Service Loans.

AAM never received any principal payments for the Debt Service Loans. Whenever there was insufficient revenue to pay the principal on the Debt Service Loans, AAM waived the required principal payment and carried over the outstanding principal balance on the Debt Service Loans to the next note.

The principal and interest payments for the Debt Service Loans were ninth in the priority of payment in section 5.2(b) of the management agreement (i.e., section 5.2(b)(ix)).

Deloitte's annual financial statements for the Honda Center and for AAM reported AAM's advances as debt.

None of AAM's advances is debt. *See infra* OPINION Part I.B.

V. *Bolar and Bellew's advice on whether AAM could claim a bad-debt deduction; AAM's claim of a bad-debt deduction*

In March 2015, Bill Foltz became chief financial officer of the Samueli entities. One of Foltz's first projects as chief financial officer was to review AAM's performance and obligations under the management agreement. Foltz had internal discussions with the following individuals: (1) Ryan; (2) Schulman; (3) James Pearson, an employee of AAM who worked as the controller for the Honda Center; (4) David Murphy, the tax director for H&S Ventures; and (5) Bernard Schneider, an attorney for the Samueli entities who had represented AAM in negotiating the management agreement with the City. Schneider advised Foltz that it was unlikely that AAM's advances would ever be repaid.

Foltz agreed that AAM's advances would never be repaid, a conclusion he explained in a memorandum to Murphy on December 31, 2015. Foltz further discussed the advances with Murphy and Schulman. The three concluded that they should consult Dan Bolar on the appropriate tax treatment of the advances. Bolar is a certified public accountant (CPA) and is a partner in the accounting firm Bolar Hirsch & Jennings (BHJ). BHJ had done accounting work for the Samueli entities since late 2002 or early 2003 and became involved with AAM shortly after AAM entered into the management agreement with the City on December 16, 2003.

**[\*34]** Bolar enlisted Christopher Bellew, a CPA who worked with Bolar at BHJ, to determine the correct tax treatment of the advances. Bolar chose Bellew to analyze the issue because Bellew was one of the most technically proficient CPAs at BHJ. Before this project, Bellew had not done work for AAM but had done work for other of the Samueli entities.

Both Schulman and Murphy considered Bolar and Bellew to be experts in accounting and tax matters.

Bolar and Bellew understood that their task was to determine the correct tax treatment of the advances.

Bellew requested and received documents from Murphy concerning the history of AAM's advances and the current financial situation of the Honda Center business. These documents included (1) a copy of the management agreement; (2) the memo from Foltz to Murphy dated December 31, 2015, explaining why he believed the advances would not be repaid; (3) Deloitte's combined annual financial statements for the Honda Center's business activities and AAM for the fiscal years ended June 30, 2014 and 2015; (4) the outstanding balance of all the advances as of June 30, 2015; (5) a copy of the note for the Operating Loans and the Debt Service Loans dated June 30, 2015; (6) a copy of the note for the Cap Ex Loans dated September 30, 2014; (7) schedules listing all of AAM's advances and any principal and interest payments received by AAM for the advances; and (8) two valuation reports from Cogent Valuation, an independent appraiser that reviewed the advances and the Honda Center's business activities and concluded that all of the advances were worthless as of December 31, 2015.

As part of his analysis of the correct tax treatment of the advances, Bellew concluded that all of the advances were debt.

With Bolar's help, Bellew wrote a memo, dated March 4, 2016, stamped as a "draft," that analyzed the appropriate treatment of the advances. Bellew's memo did not specifically analyze whether the advances were debt (i.e., loans) but did refer to the advances as loans. The memo concluded that AAM had a bad-debt deduction for the advances for tax year 2005.

On March 11, 2016, Foltz, Murphy, Bolar, and Bellew met to review Bellew's memo. Whether the advances were debt was not discussed during the meeting on March 11, 2016. Foltz and Murphy informed Bolar and Bellew that (1) the facts as stated in Bellew's memo were correct and (2) there were no remaining questions or issues that

**[*35]** needed to be addressed. After the meeting with Foltz and Murphy, Bolar and Bellew did not see a need to complete another version of Bellew's memo. Thus, Bellew's memo "DRAFT" effectively became the final opinion given by Bolar and Bellew on whether AAM could claim a bad-debt deduction for its advances.

After March 11, 2016, but before June 16, 2016, Schulman reviewed Bellew's memo. Schulman had the final authority to claim the bad-debt deduction on AAM's return. After discussing Bellew's memo with Foltz and Murphy, Schulman decided to claim the bad-debt deduction on AAM's 2015 return.

Schulman relied on Bellew's memo to determine whether to claim a bad-debt deduction for its advances on AAM's 2015 return.

The table below shows the outstanding principal and interest balances for each type of advance as of December 31, 2015:

| Type of advance | Principal | Interest | Total |
|---|---|---|---|
| Operating Loans | $29,001,002 | $588,539 | $29,589,541 |
| Debt Service Loans | 10,371,457 | 226,371 | 10,597,829 |
| Cap Ex Loans | 11,037,036 | 240,822 | 11,277,858 |
| Total | $50,409,496 | $1,055,733 | $51,465,228 |

Bolar prepared AAM's 2015 Form 1065, U.S. Return of Partnership Income, and signed the Form 1065 as AAM's tax preparer on June 16, 2016. On line 12 of the Form 1065, AAM claimed a $51,465,228 bad-debt deduction.

AAM's 2015 Form 1065 stated that H&S Investments was AAM's tax matters partner for 2015. The Form 1065 gave the mailing address for H&S Investments. The Form 1065 included Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for each of AAM's members for 2015 (i.e., HS Portfolio and H&S Investments). The Schedule K–1 for HS Portfolio stated that HS Portfolio (1) was the "LLC member-manager" for 2015 and (2) had a 45% profits interest in AAM. The Schedule K–1 for H&S Investments stated that H&S Investments (1) was an "other LLC member" for 2015, (2) was not the "LLC member-manager" for 2015, and (3) had a 55% profits interest in AAM.

VI.    *IRS audit and determination; the FPAA*

The IRS audited the 2015 return of AAM. The audit was assigned to Revenue Agent John Swann (RA Swann).

**[*36]** On January 30, 2019, RA Swann sent a letter to H&S Investments purporting to designate it the tax matters partner of AAM:

> H&S Investments I, LP [i.e., H&S Investments] is the Tax Matters Partner for the Limited Liability Company year(s) [i.e., 2015] since that person is the member-manager with the largest profits interest as of the end of the year(s) in question or, because that member-manager is the one whose name appears first in the alphabetical listing of partners with the same profits interest.

In February 2019, RA Swann concluded the audit and sent AAM a revenue agent report (February 2019 RAR). The February 2019 RAR, which is not in the record, did not assert a penalty. This reflected RA Swann's view at the conclusion of the audit, that a penalty should not be asserted.

In April 2019, RA Swann sent AAM a new revenue agent report (April 2019 RAR) to correct an error in the February 2019 RAR. The April 2019 RAR, which is not in the record, did not assert a penalty.

RA Swann sent a draft FPAA regarding AAM to Kevin Coy (Senior Counsel Coy), a senior counsel with IRS Office of Chief Counsel. The draft FPAA did not assert a penalty.

Senior Counsel Coy determined that the FPAA should assert an accuracy-related penalty.

On May 30, 2019, Hans Famularo (Associate Area Counsel Famularo), who was Associate Area Counsel (SB/SE), wrote a memorandum stating that Senior Counsel Coy had determined to assert the accuracy-related penalty and that he approved it. Associate Area Counsel Famularo was Senior Counsel Coy's immediate supervisor.

On May 30, 2019, Senior Counsel Coy wrote a memorandum to Nimfa Destreza, IRS TEFRA coordinator, explaining that Associate Area Counsel Famularo had on that day approved Senior Counsel Coy's determination to assert the accuracy-related penalty. Senior Counsel Coy advised that the Examination Division to execute a penalty-approval form before the issuance of the FPAA.

On May 31, 2019, RA Swann completed and signed a civil-penalty-approval form determining that an accuracy-related penalty

[*37] should be asserted as to (1) a substantial understatement of income tax and (2) negligence or disregard of rules and regulations.

On June 3, 2019, Rachel Houston (Acting Group Manager Houston) signed the civil-penalty-approval form. Acting Group Manager Houston was RA Swann's immediate supervisor.

On June 7, 2019, the IRS mailed H&S Investments the FPAA regarding AAM. The FPAA explained the disallowance of AAM's bad-debt deduction as follows: "Because there was no valid enforceable obligation to pay a fixed or determinable sum of money, your bad debt deduction was disallowed." The FPAA made no other adjustments to AAM's Form 1065 for 2015. The FPAA asserted an accuracy-related penalty related to AAM's claimed bad-debt deduction on the basis of an underpayment attributable to (1) a substantial understatement of income tax and (2) negligence or disregard of rules or regulations. The FPAA stated that the tax matters partner of AAM must file a petition within 90 days to contest the FPAA. That deadline was September 5, 2019. The FPAA also stated that if the tax matters partner did not file a petition within 90 days, any notice partner could file a petition within 150 days. That deadline was November 4, 2019.

On September 10, 2019, H&S Investments filed a Petition with this Court under section 6226(b) disputing the FPAA. In its Petition, H&S Investments stated that it was filing a Petition "in its capacity as a partner other than the [tax matters partner]." It explained: "There is confusion over which partner is tax matters partner. H&S Investments . . . may be the tax matters partner but is filing this petition in its capacity as a partner other than the tax matters partner to ensure a valid petition." When the Petition was filed, AAM's principal place of business was in California.

OPINION

Before we begin our analysis of the substantive issues in this Opinion, we address our jurisdiction over this case. A timely-filed petition is a prerequisite for the Court's jurisdiction. *See Seneca, Ltd. v. Commissioner*, 92 T.C. 363, 365 (1989), *aff'd*, 899 F.2d 1225 (9th Cir. 1990) (unpublished table decision). We conclude that AAM's Petition was timely.

Section 6226(a) provides that "[w]ithin 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a

**[\*38]** petition for a readjustment of the partnership items for such taxable year with . . . the Tax Court." Section 6231(a)(7) defines the term "tax matters partner":

> (7) Tax matters partner.—The tax matters partner of any partnership is—
>> (A) the general partner designated as the tax matters partner as provided in regulations, or
>> (B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year involved (or, where there is more than 1 such partner, the 1 of such partners whose name would appear first in an alphabetical listing).
>
> If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner. . . .

Treasury Regulation § 301.6231(a)(7)-1 provides rules for determining which partner is the tax matters partner:

> Treas. Reg. § 301.6231(a)(7)-1 Designation or selection of tax matters partner.
>> (a) In general. A partnership may designate a partner as its tax matters partner for a specific taxable year only as provided in this section. . . . If a partnership does not designate a general partner as the tax matters partner for a specific taxable year, . . . the tax matters partner is the partner determined under this section.
>> (b) Person who may be designated tax matters partner—(1) General requirement. A person may be designated as the tax matters partner of a partnership for a taxable year only if that person—
>>> (i) Was a general partner in the partnership at some time during the taxable year for which the designation is made; or
>>> (ii) Is a general partner in the partnership as of the time the designation is made.
>>
>> . . . .

**[\*39]** (c) Designation of tax matters partner at time partnership return is filed. The partnership may designate a tax matters partner for a partnership taxable year on the partnership return for that taxable year in accordance with the instructions for that form.

. . . .

(m) Tax matters partner where no partnership designation made—(1) In general. The tax matters partner for a partnership taxable year shall be determined under this paragraph (m) if—

(i) The partnership has not designated a tax matters partner under this section for that taxable year; . . .

. . . .

(2) General partner having the largest profits interest is the tax matters partner. The tax matters partner for any partnership taxable year to which this paragraph (m) applies is the general partner having the largest profits interest in the partnership at the close of that taxable year (or where there is more than one such partner, the one of such partners whose name would appear first in an alphabetical listing). . . . For purposes of this paragraph (m)(2), the general partner with the largest profits interest is determined based on the year-end profits interests reported on the Schedules K–1 filed with the partnership income tax return for the taxable year for which the determination is being made.

. . . .

(n) Selection of tax matters partner by Commissioner when impracticable to apply the largest-profits-interest rule. If the partnership has not designated a tax matters partner under this section for the taxable year and it is impracticable . . . to apply the largest-profits-interest rule of paragraph (m)(2) of this section, the Commissioner will select a tax matters partner . . . .

Treasury Regulation § 301.6231(a)(7)-2 provides rules for applying section 6231(a)(7) and Treas. Reg. § 301.6231(a)(7)-2 to a limited liability company that is treated as a partnership for federal tax purposes:

**[\*40]** Treas. Reg. § 301.6231(a)(7)-2 Designation or selection of tax matters partner for a limited liability company (LLC).

(a) In general. Solely for purposes of applying section 6231(a)(7) and § 301.6231(a)(7)–1 to an LLC, only a member-manager of an LLC is treated as a general partner, and a member of an LLC who is not a member-manager is treated as a partner other than a general partner.

(b) Definitions—

. . . .

(2) Member. Solely for purposes of this section, *member* means any person who owns an interest in an LLC.

(3) Member-manager. Solely for purposes of this section, *member-manager* means a member of an LLC who, alone or together with others, is vested with the continuing exclusive authority to make the management decisions necessary to conduct the business for which the organization was formed. Generally, an LLC statute may permit the LLC to choose management by one or more managers (whether or not members) or by all of the members. If there are no elected or designated member-managers (as so defined in this paragraph (b)(3)) of the LLC, each member will be treated as a member-manager for purposes of this section.

Section 6226(b)(1) provides that, if the tax matters partner does not file a petition within 90 days after the IRS mails the FPAA, "any notice partner . . . may, within 60 days after the close of the 90-day period set forth in subsection (a), file a petition" with the Tax Court. A notice partner is "a partner who, at the time in question, would be entitled to notice under subsection (a) of section 6223." § 6231(a)(8). Section 6223(a) requires the IRS to mail an FPAA to each partner whose name and address is furnished to the IRS (for example, on the partnership return, § 6223(c)(1)).

Only a tax matters partner can file a petition under section 6226(a), which permits a petition to be filed within 90 days after the FPAA is mailed. The Petition, filed by H&S Investments, was not filed by the 90-day deadline specified by section 6226(a).

**[\*41]** Section 6226(b) provides that if the 90-day deadline imposed by section 6226(a) expires without the filing of a petition by the tax matters partner, any notice partner may file a petition within 60 days after the close of the 90-day period in which the tax matters partner may petition the court. H&S Investments was a notice partner. Therefore, its Petition, filed on day 95, was timely. This is true even if H&S Investments was also the tax matters partner. *See Barbados #6 Ltd. v. Commissioner*, 85 T.C. 900, 904–05 (1985) (holding that a tax matters partner who fails to file a petition by the 90-day deadline may file a petition in its capacity as a notice partner by the 150-day deadline). We conclude that we have jurisdiction to readjust partnership items of AAM for 2015. *See* § 6226(a). As explained *infra* OPINION Part II, we also have jurisdiction over the applicability of the accuracy-related penalty for that year.

I.     *AAM cannot deduct its advances as a bad debts because the advances are not debts.*

Our authority to determine the merits of AAM's bad-debt deduction is found in section 6221. Section 6221 provides that "the tax treatment of any partnership item . . . shall be determined at the partnership level." Section 6231(a)(3) defines the term "partnership item" to mean

> with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

Treasury Regulation § 301.6231(a)(3)-1 provides, in relevant part:

> Treas. Reg. § 301.6231(a)(3)-1(a) In general. For purposes of subtitle F of the Internal Revenue Code . . . , the following items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items:
>
> > (1) The partnership aggregate and each partner's share of each of the following:

**[*42]** (i) Items of income, gain, loss, deduction, or credit of the partnership;

AAM's bad-debt deduction is a "deduction . . . of the partnership," Treas. Reg. § 301.6231(a)(3)-1(a)(1)(i), and is thus a partnership item. We have jurisdiction to readjust the FPAA's adjustment to that deduction.

The burden of proof is borne by H&S Investments. In general, the IRS's adjustments reflected in an FPAA are presumed correct, and the taxpayer has the burden of proving that the IRS's adjustments are erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Section 7491(a)(1) shifts the burden of proof as to any factual issue to the IRS if the "taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B" and if the taxpayer satisfies the conditions in section 7491(a)(2). A taxpayer bears the burden of proving that the conditions in section 7491(a)(2) are satisfied. *See Higbee v. Commissioner*, 116 T.C. 438, 440–41 (2001). Because H&S Investments has neither contended nor adduced evidence that the requirements of section 7491(a)(2) are met, section 7491(a)(1) does not shift the burden of proof to the IRS. Therefore, H&S Investments has the burden of proving that the IRS's adjustment in the FPAA to AAM's bad-debt deduction is erroneous. Additionally, H&S Investments has the burden of proving that the accuracy-related penalty does not apply. *See* Rule 142(a)(1); *Green Valley Invs., LLC v. Commissioner*, T.C. Memo. 2025-15, at *37.

Section 166(a)(1) allows a deduction against ordinary income for "debt which becomes worthless within the taxable year." Thus, a bad-debt deduction under section 166(a)(1) is allowed if (1) there is a debt owed to the taxpayer and (2) that debt became worthless during the taxable year.

Whether AAM's advances became worthless during 2015 is not at issue.[24] Therefore, AAM can deduct its advances as bad debts if they are debts.

---

[24] The FPAA explained the disallowance of AAM's bad-debt deduction as follows: "Because there was no valid enforceable obligation to pay a fixed or determinable sum of money, your bad debt deduction was disallowed." Thus, by its terms, the FPAA did not disallow AAM's bad-debt deduction on the grounds that the

**[\*43]** Treasury Regulation § 1.166-1(c) provides: "Only a bona fide debt qualifies for the purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." The U.S. Court of Appeals for the Ninth Circuit, to which appeal of this case will lie absent stipulation by the parties otherwise, *see* § 7482(b)(1)(E), considers the following factors for determining whether there is a debt for federal income tax purposes:

> (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation and

---

advances had not become worthless during 2015. The IRS's Answer similarly did not assert that the advances did not become worthless during 2015. It was only on September 18, 2020, shortly before the scheduled October 29 and 30, 2020, trial that the IRS asserted that the advances did not become worthless during 2015.

On September 18, 2020, the IRS moved for a continuance on the grounds that it needed more time to prepare for trial on the issue of whether AAM's advances were debt. At the beginning of the Motion, the IRS stated there were two issues for trial: (1) whether the advances were debt and (2) if the advances were debt, whether they were bad debt (i.e., whether they had become worthless during 2015).

On October 5, 2020, the IRS filed its Pretrial Memorandum. The Pretrial Memorandum asserted that the advances did not become worthless during 2015.

On October 13, 2020, the Court ordered struck the portions of the IRS Pretrial Memorandum asserting that the advances had not become worthless during 2015. Our Order stated that the only proper nonpenalty issue for trial was whether the advances were debt. The Court explained that (1) the worthlessness issue had not been raised in the FPAA, (2) the issue had not been properly pleaded by the IRS, and (3) trial of the issue would prejudice H&S Investments.

On October 29 and 30, 2020, the first phase of the trial addressed issues other than the applicability of the accuracy-related penalty. Relying on the Court's Pretrial Order of October 13, 2020, H&S Investments did not present evidence regarding the worthlessness issue.

On February 24, 2021, after the first phase of the trial, the IRS filed a Motion to Conform the Pleadings to the Proof under Rule 41(b)(1). The Motion sought the Court's permission to amend the IRS's Answer to assert that even if the advances were a bona fide debt, the debt did not become worthless during 2015.

On February 25 and 26, 2021, the second phase of the trial occurred, which related only to the applicability of the section 6662(a) penalty.

On June 3, 2021, we denied by Order the IRS's Motion to Conform the Pleadings to the Proof because we concluded that H&S Investments would be prejudiced if the Answer were amended to assert that the advances did not become worthless during 2015.

**[\*44]** management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stock holder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions.

*A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970) (quoting *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d 123, 125–26 (9th Cir. 1960), *aff'g* T.C. Memo. 1959-110). No one factor is determinative. *Id.* The ultimate inquiry is resolved by the economic substance of the transaction, not its form. *Id.* at 1334.

### A.    *Names*

The first factor to consider is the "names given to the certificates evidencing the indebtedness." *See A.R. Lantz Co.*, 424 F.2d at 1333 (quoting *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d at 125–26). H&S Investments contends that this factor indicates that the advances are debt. It argues that "every advance that became part of one of the Three Loans was made pursuant to a Subordinated Promissory Note." It further argues that "[t]hese were standard notes that clearly were labeled as debt instruments."

Each advance is related to a note, and each such note is titled "SUBORDINATED PROMISSORY NOTE." The label is suggestive of debt. *See Hardman v. United States*, 827 F.2d 1409, 1412 (9th Cir. 1987) ("The issuance of a . . . note indicates a bona fide indebtedness."). Furthermore, the notes purport to impose on the "Borrower" (defined as "Arrowhead Pond of Anaheim") an obligation to repay a principal amount to the "Lender" (defined as AAM). These words too are suggestive of debt.

But most of the notes have only one signatory, "the Honda Center." The remaining notes are signed by both AAM and the Honda Center. But the Honda Center is a building managed by AAM. It is not a legal person with the ability to enter into an enforceable contract or the ability to sue and be sued. Thus, the notes are not agreements between legal persons and therefore do not constitute self-standing contracts. Their legal significance must be found elsewhere. The actual role of the notes is indicated by this and similar statements in their prefaces: The "loans may be used to fund operating expenses (operating

**[\*45]** loans) debt service (debt service loans) or capital expenditures (capital expenditure loans) . . . as defined in . . . the Facilities Management Agreement between the City of Anaheim and Anaheim Arena Management LLC dated December 16, 2003." This statement correctly suggests that it is the management agreement that governs the advances to which the notes relate.

We therefore turn to the management agreement to determine what label it gives the advances. Again, there are words suggestive of debt. The management agreement refers to "Other Debt," "Operating Loans," and "Debt Services Loans." It is undisputed that these terms include the three types of advances made by AAM. The waterfall provision of the management agreement gives sixth priority to "Other Debt," which indisputably includes the Cap Ex Loans. The eighth priority is given "Operating Loans," which indisputably includes the Operating Loans. And the ninth priority is given to "Debt Service Loans," which indisputably includes the Debt Service Loans.

However, other provisions of the management agreement suggest that the advances are not mere loans. Section 1 of the management agreement gives AAM "an exclusive license to operate the Facility [defined as the arena and parking lot, i.e., the Honda Center]." Section 1 of the management agreement provides that AAM has "an exclusive right . . . to "purchase, create, produce, self-promote, co-promote, coordinate and stage . . . all acts and events to be held at the Facility." Section 1 of the management agreement imposes on AAM the duty to "maintain the Facility . . . as a sport and entertainment facility in Acceptable Condition." Section 3 of the management agreement imposes further specific duties on AAM. One such duty, imposed by section 3(g) of the management agreement, is, if there is a shortfall in the finances of the Honda Center business, to "make, or cause . . . a third party lending institution to make, Operating Loans or Debt Service Loans." Although AAM could have made up the financial shortfall through third-party borrowings, it did not do so. It makes advances only with its own funds. These provisions granting AAM rights (and imposing on it duties) as manager indicate that its advances were made as part of its contractual role as the manager of the Honda Center.

Another relevant provision of the management agreement is a portion of the waterfall provision, found in section 5.2(b)(11) of the management agreement, that entitles AAM to residual profits from the Honda Center operations. AAM was entitled to 100% of the residual profits up to $12 million, and 75% of the residual profits above $12

**[\*46]** million. The right to residual profits indicates that advances by AAM functioned to help ensure the success of the Honda Center business so as to increase the amount that AAM would receive as its share of the residual profits.

Thus, the provisions of the management agreement demonstrate that the advances were not mere loans in exchange for the promise of repayment of principal and interest. The advances fulfilled AAM's contractual duty as manager of the Honda Center, imposed by sections 1 and 3 of the management agreement, satisfaction of which was rewarded with a share of the residual profits under section 5.2(b)(11) of the management agreement.

In conclusion, labels given the advances do not indicate they are debt.

### B. *Maturity date*

The second factor that indicates debt is a maturity date. *See A.R. Lantz Co.*, 424 F.2d at 1333. A maturity date supports the conclusion that an advance is a debt. *See Estate of Mixon v. United States*, 464 F.2d 394, 404 (5th Cir. 1972). By contrast, "[t]he absence of a fixed maturity date indicates that repayment is tied to the fortunes of the business" and that the advance is not a debt. *Hardman*, 827 F.2d at 1413. H&S Investments argues that the existence of a maturity date in each note indicates that the advances are debt.

A maturity date means the date by which a borrower must repay the entire principal. *See Monon R.R. v. Commissioner*, 55 T.C. 345, 359 (1970) ("[A] definite maturity date on which the principal falls due for payment, without reservation or condition, . . . is a fundamental characteristic of a debt."). Not all debts may have maturity dates.

All the notes to which the Operating Loans and Debt Service Loans relate provide that the advances had a maturity date one year from the date of the note. The notes to which the Cap Ex Loans relate also have maturity dates. The maturity dates vary.

The mere existence of these maturity dates does not indicate that the advances are debt.

First, under the terms of the notes, each maturity date could be extended at the sole discretion of AAM. Because AAM controls the money which the notes are to be paid (through its management of the

[*47] Honda Center), the maturity date is not a true deadline. And in practice, AAM exercised this discretion: It decided not to repay the Operating Loans and the Debt Service Loans on the maturity dates in the notes. Second, the obligation to repay principal and interest could be paid only if there were sufficient residual profits from the Honda Center business. Third, under the provisions of the management agreement, the investment return on the advances was not solely in the form of interest and principal. It also made the payment in order to maximize and preserve its share of the residual profits under section 5.2(b)(xi) of the management agreement. By its nature, this portion of AAM's investment return had no maturity date on the advances.

We conclude that this factor does not indicate that the advances were debt.

C. *Source of payments*

The third factor is the "source of the payments." *A.R. Lantz Co.*, 424 F.2d at 1333 (quoting *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d at 125–26). When payment is limited to the borrower's profits or to a specific source of money, this limitation indicates that the advance is not debt. *See Hardman*, 827 F.2d at 1413; *Anchor Nat'l Life Ins. Co. v. Commissioner*, 93 T.C. 382, 406 (1989) (finding an advance does not have the appearance of debt "[i]f repayment is possible only out of corporate earnings").

The parties to this case agree that repayment of AAM's advances, and payment of the Honda Center's residual profits, is limited to the revenues generated by the Honda Center's business activities. H&S Investments argues that there are many forms of debt in which the source of repayment is limited to a specific revenue stream. *See, e.g.*, *Monon R.R.*, 55 T.C. at 360–61. But the fact that repayment of the advances, and the payment of residual profits, can be made only from the Honda Center's revenues, greatly increases the uncertainty of repayment of the advances or payment of an investment return on the advances. *See Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968) (stating that a true lender is concerned about a reliable return on its investment). For these reasons, this factor does not indicate that the advances are debt.

D. *Right to enforce repayment*

The fourth factor is the right of the lender to enforce repayment. *See A.R. Lantz Co.*, 424 F.2d at 1333. An enforceable and definite

**[*48]** obligation to repay an advance indicates the advance is a debt. *Hardman*, 827 F.2d at 1413.

The notes themselves are not self-standing legal obligations because they were executed only by AAM. Thus, the notes alone do not evidence a right by AAM to enforce repayment of the advances. The management agreement provides that AAM will receive payment only if the Honda Center's business activities produce sufficient revenues. When the Honda Center's business activities do not generate sufficient revenues, AAM has no recourse to enforce repayment of the advances, or payment of any residual profits under section 5.2(b)(xi) of the management agreement. AAM would instead have to wait until there is sufficient revenue before it could receive payment. There was always the possibility that revenue would be insufficient to repay any advances to AAM, or any investment return on these advances. We therefore conclude that this factor does not indicate that the advances are debt.

### E.    *Participation and management*

The fifth factor is whether the advances increase AAM's participation in and management of the Honda Center's business activities. *See A.R. Lantz Co.*, 424 F.2d at 1333. When an advance provides the taxpayer with a right to participate in management, this participation indicates that the advance is not debt. *See Hardman*, 827 F.2d at 1413.

H&S Investments argues that this factor indicates the advances are debt because the advances did not "[increase] AAM's management rights in any respect." We disagree. AAM made the advances as part of its duties as manager. Had AAM failed to make the advances, AAM would have been in violation of its obligations in the management agreement. AAM would then have been at risk of losing its right to manage the Honda Center. Therefore, AAM's commitment to make the advances preserved AAM's exclusive management rights in the Honda Center's business activities. This factor does not indicate that the advances are debt.

### F.    *Status equal to or inferior to that of other creditors*

The sixth factor is whether the putative lender has a repayment status equal to or inferior to that of the putative borrower's creditors. *See A.R. Lantz Co.*, 424 F.2d at 1333. If the advances are subordinated to "regular" creditors, this indicates that the advances are not debt. *See*

**[\*49]** *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc. Commissioner*, 97 T.C. 579, 603 (1991).

H&S Investments contends that this factor indicates that the advances are debt because AAM's advances are higher in priority in the waterfall agreement than the claims of certain other claimants who, H&S Investments contends, hold rights that are undisputably debt. H&S Investment observes that principal and interest on the Cap Ex Loans were sixth in the priority of payment, which places the principal and interest on the Cap Ex Loans ahead of the required payments for (1) the 2003 Facility Financing Debt Service (seventh in the priority of payment) and (2) the Reimbursement Agreement (tenth in the priority of payment). H&S Investments further observes that principal and interest on the Operating Loans were eighth in the priority of payment, that principal and interest on the Debt Service Loans were ninth in the priority of payment, thus placing principal and interest on the Operating Loans and the Debt Service Loans ahead of the required payment for the Reimbursement Agreement.

We are unpersuaded of the significance of the position of the seventh and tenth priorities in relation to the priority accorded the advances. The obligations given the seventh and tenth priorities are not so firm as to be clearly characterized as debt. Repayment of these obligations appears to be contingent on sufficient revenues from the Honda Center's business activities. We do not conclude that the holders of these obligations are regular creditors. *See Am. Offshore*, 97 T.C. at 603. We therefore do not assign great significance to the priority of these obligations in comparison to AAM's advances.

Furthermore, except for the seventh and eight priorities (i.e., the 2003 Facility Financing Debt Services and the Reimbursement Agreements, respectively), the three types of advances made by AAM were ahead of all other creditors except those who share the 11th priority to portions of the residual profit. Furthermore, in our view, AAM's right to a portion of the residual profit was part of the investment return that AAM expected to receive in exchange for all three types of advances. This conclusion is reinforced by the low interest rate on the advances—prime rate plus 1%. Pearson (the controller for the Honda Center) and Robert Zadek (an expert witness in midmarket financing called by the IRS) persuasively testified that a third party would not have made the advances for such low rates. AAM made the advances to satisfy its management obligations under the management agreement and to preserve the residual profits to which it was entitled. That part

**[\*50]** of AAM's investment return on the advances was 11th in the priority of payment and was not superior to or equal to any of the Honda Center's creditors.

We therefore conclude that this factor does not indicate that the advances are debt.

### G. *The parties' intent*

The seventh factor is "the intent of the parties." *A.R. Lantz Co.*, 424 F.2d at 1333 (quoting *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d at 125–26). This factor looks to objective evidence of the parties' intent. *See Hewlett-Packard Co. & Consol. Subs. v. Commissioner*, 875 F.3d 494, 498–99 (9th Cir. 2017), *aff'g* T.C. Memo. 2012-135.

H&S Investments argues that three types of documents evidence the parties' intent to treat the advances as debt. First, H&S Investments points to the labels of the notes documenting the advances. Second, Deloitte completed financial statements for both AAM and the Honda Center's business activities, and these financial statements recorded the advances as debt. Third, the City referred to the advances as "loans" in the discussion section of its annual financial statements.

In our view, the "parties" to the advances consist of AAM and the City. Although the ostensible borrower of the advances was the Honda Center, the Honda Center is a building without legal personhood. Thus, although the Honda Center signed the notes, the notes have no legal significance outside the management agreement. The parties to the management agreement were AAM and the City. The best evidence of their intent is the management agreement itself, the provisions of which indicate that the advances are not debt. In our view, the amounts of the advances, as recorded on Deloitte's financial statements, helped measure AAM's compliance with the management agreement and rewards under the management agreement. They do not communicate AAM's view that it has a debt obligation to a borrower. That the City referred to the advances as "loans" similarly does not communicate the City's view that it is a borrower.

We conclude that AAM and the City have not objectively manifested their intent to treat the advances as debt. This factor does not indicate that the advances are debt.

**[\*51]** H.     *"Thin" or adequate capitalization*

The eighth factor is whether the party receiving the advance was adequately capitalized when the advance was made. *See A.R. Lantz Co.*, 424 F.2d at 1333. Capitalization is often measured by comparing the borrower's debt to its equity. *See, e.g.*, *Bauer v. Commissioner*, 748 F.2d 1365, 1368–70 (9th Cir. 1984), *rev'g* T.C. Memo. 1983-120. The management agreement limited the source for payment to only the revenues generated by the Honda Center's business activities.

The history of payments on the Cap Ex Loans indicates that the Honda Center earned sufficient revenues to pay principal and interest on the Cap Ex Loans through at least March 31, 2014. But AAM did not receive any principal payments for the Cap Ex Loans after March 31, 2014. This indicates that the Honda Center's revenues were insufficient to fully repay the principal payments for the Cap Ex Loans after March 31, 2014.

The history of payments on the Operating Loans and the Debt Service Loans shows that the Honda Center's revenues were sufficient to at least pay the interest on the Operating Loans and the Debt Service Loans. However, AAM received no principal payments for the Debt Service Loans and received few principal payments for the Operating Loans. This strongly indicates that the Honda Center's revenues were insufficient to fully repay the Operating Loans and the Debt Service Loans.

Finally, part of AAM's return was its claim to a portion of the Honda Center's residual profits under section 5.2(b)(xi) of the management agreement. AAM was paid under section 5.2(b)(xi) of the management agreement in only two of the fiscal years that AAM managed the Honda Center. This strongly indicates that the Honda Center's revenues were insufficient to pay AAM residual profits under section 5.2(b)(xi) of the management agreement.

Therefore, we conclude that this factor does not indicate that the advances are debt.

I.     *Identity of interest*

The ninth factor is whether there is an identity of interest between the creditor making the advance and the owner of the entity receiving the advance. *See A.R. Lantz Co.*, 424 F.2d at 1333. Evaluating this factor involves the question of whether the putative lender owns the

[*52] putative debtor. *See, e.g.*, *Segel v. Commissioner*, 89 T.C. 816, 830 (1987); *Gooding Amusement Co. v. Commissioner*, 23 T.C. 408, 418 (1954), *aff'd*, 236 F.2d 159 (6th Cir. 1956); *see also Moughon v. Commissioner*, T.C. Memo. 1963-25, 22 T.C.M. (CCH) 94, 99–100, *aff'd*, 329 F.2d 399 (6th Cir. 1964). If an advance is in proportion to the lender's ownership interest in the borrower, this indicates that the advance is not debt. *See Hardman*, 827 F.2d at 1414; *Am. Offshore*, 97 T.C. at 604–05. A sole shareholder's advance is more likely committed to the risk of the business than an advance from a creditor who is not a shareholder. *Ga.-Pac. Corp. v. Commissioner*, 63 T.C. 790, 797 (1975).

H&S Investments argues that this factor indicates the advances are debt because AAM, which made all of the advances, has no ownership interest in the Honda Center. We disagree. Although AAM has no ownership stake in the Honda Center—the building is owned by the City—AAM has an equity-like stake in the profits from the operation of the Honda Center. AAM has a right to 100% of the residual profits up to $12 million and 75% of the residual profits above $12 million. Under the management agreement, therefore, AAM is committed to the risk of the business conducted at the Honda Center.

We conclude that this factor does not indicate the advances are debt.

J.     *Payment of interest only out of "dividend" money*

The tenth factor is "payment of interest only out of 'dividend' money." *See A.R. Lantz Co.*, 424 F.2d at 1333 (quoting *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d at 125–26). Part of AAM's expected investment return on the advances was the return stated in the notes themselves: Interest accruals at prime plus 1% on the outstanding balance of the advances. But AAM would not receive such payment unless the Honda Center earned sufficient revenues. *Cf. Hardman*, 827 F.2d at 1414 ("The company was obligated to pay regardless of whether it had accumulated earnings and profits."). And part of AAM's return was its right to a portion of the Honda Center's residual profits. The latter portion of AAM's return was a variable return that would also depend on the residual profits earned by the Honda Center. For the foregoing reasons, we conclude that this factor does not indicate that the advances are debt.

**[\*53]** K.   *The ability to obtain loans from outside lenders on substantially similar terms*

The 11th and final factor is whether the alleged borrower could have borrowed the advances from a third-party lender on substantially similar terms. *See A.R. Lantz Co.*, 424 F.2d at 1333; *Segel*, 89 T.C. at 832–34.

AAM would not have made the advances at the same interest rate as a third-party lender. AAM was willing to make the advances at a relatively low interest rate (prime plus 1%) because (1) it was required to maintain the Honda Center as a functioning arena (and thus it made the advances including the Cap Ex Loans), (2) it was required to make up shortfalls in the finances of the Honda Center activity (and thus it made the Operating Loans and the Debt Service Loans), and (3) it received a share of the residual profits form the Honda Center activity.

We therefore conclude that this factor does not indicate the advances are debt.

L.   *Conclusion*

None of the 11 factors indicates that the advances were debt. We conclude that the advances are not debt. We therefore sustain the IRS's disallowance of AAM's bad-debt deduction.

II.   *An accuracy-related penalty is not applicable to AAM's claim of a bad-debt deduction because AAM had reasonable cause for and acted in good faith in claiming the bad-debt deduction.*

For 2015, the FPAA determined an accuracy-related penalty under section 6662(a) and (b)(1) or (2) for an underpayment attributable to substantial understatement of income tax or negligence or disregard of rules or regulations. The accuracy-related penalty relates only to AAM's bad-debt deduction; the FPAA did not make any other adjustments to partnership items for 2015.

Section 6221 provides that "the applicability of any penalty . . . which relates to an adjustment to a partnership item . . . shall be determined at the partnership level." Section 6226(f) provides that a court's jurisdiction as to penalties in a partnership-level case such as this one is limited to "the applicability of any penalty . . . which relates to an adjustment to a partnership item." Treasury Regulation § 301.6221-1(c) provides that "[p]artnership-level determinations

**[\*54]** include all the legal and factual determinations that underlie the determination of any penalty . . . other than partner-level defenses." "[T]he court has jurisdiction in the partnership-level proceeding to determine any penalty . . . that relates to an adjustment to a partnership item." Treas. Reg. § 301.6226(f)-1(a). "However, the court does not have jurisdiction in the partnership-level proceeding to consider any partner-level defenses to any penalty . . . that relates to an adjustment to a partnership item." *Id.*

A substantial understatement of income tax exists if the amount of the understatement for the taxable year exceeds the greater of (1) 10% of the tax required to be shown on the return for the taxable year or (2) $5,000. § 6662(d)(1). An understatement is the amount of the tax required to be shown on the return for the taxable year minus the amount of the tax actually shown on the return. *Id.* para. (2). The understatement is calculated at the partner level, not at the partnership level. *See Murfam Enters. LLC v. Commissioner*, T.C. Memo. 2023-73, at \*33. "[T]he determination of an [understatement] cannot happen at the partnership level . . . . We can, however, still determine the *applicability* of the understatement . . . penalty, at the partnership level." *VisionMonitor Software, LLC v. Commissioner*, T.C. Memo. 2014-182, at \*16; *see also United States v. Woods,* 571 U.S. 31, 41 (2013).

Section 6662(d)(2)(B) provides that the amount of the understatement is reduced by the portion of the understatement which is attributable to (1) the tax treatment of any item by the taxpayer for which there is or was substantial authority for such treatment or (2) an item for which (a) the facts affecting the item's tax treatment are adequately disclosed on the return and (b) there is a reasonable basis for the tax treatment of the item by the taxpayer.

Section 6662(c) provides that "[f]or purposes of [section 6662], the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." *See also* Treas. Reg. § 1.6662-3(b)(1). A taxpayer is not negligent if the position taken on the return has a reasonable basis. *Id.*

The existence of negligence is determined at the partnership level. *See Oakbrook Land Holdings, LLC v. Commissioner*, T.C. Memo. 2020-54, at \*41 (stating that the negligence penalty is applicable when a partnership takes a return position that is negligent).

**[\*55]** The section 6662(a) penalty is not imposed if it is shown that the taxpayer had reasonable cause for and acted in good faith in claiming a deduction. § 6664(c)(1). Whether AAM had reasonable cause and acted in good faith is a partnership-level defense that can be determined in this case. *See* Treas. Reg. §§ 301.6221-1(c), 301.6226(f)-1(a). In general, we determine whether a partnership had reasonable cause by evaluating the state of mind of its general partner or member-manager. *See Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91 (2011), *aff'd*, 728 F.3d 676 (7th Cir. 2013). In this case, however, the authority to claim the bad-debt deduction on AAM's return was delegated to Schulman. Therefore, we must evaluate Schulman's state of mind when he decided that AAM should claim the bad-debt deduction. *See New Millenium Trading, LLC v. Commissioner*, T.C. Memo. 2017-9, at \*41.

The relevant regulations provide that "whether a taxpayer acted with reasonable cause and in good faith is [determined] on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.* Good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may also constitute reasonable cause. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); Treas. Reg. § 1.6664-4(c)(1); *see also United States v. Boyle*, 469 U.S. 241, 250 (1985). Treasury Regulation § 1.6664-4(c)(2) provides:

> Advice is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty. Advice does not have to be in any particular form.

This Court has stated that reasonable cause and good faith are present if "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology*

**[\*56]** *Assocs.*, 115 T.C. at 99. H&S Investments has the burden of proving reasonable cause and good faith. *See Higbee*, 116 T.C. at 446–47.

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." For cases appealable to the Ninth Circuit, supervisory approval is timely if secured before the penalty is assessed or "before the relevant supervisor loses discretion whether to approve the penalty assessment." *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, 161 T.C. 104, 110–11 (2023). H&S Investments has the burden of proving that the IRS did not satisfy section 6751(b)(1). *See supra* OPINION Part I.

A.     *The IRS satisfied section 6751(b)(1).*

We will first address whether the IRS satisfied section 6751(b)(1).

H&S Investments contends that Senior Counsel Coy did not make the initial determination to assert a penalty. Instead, H&S Investments argues, Senior Counsel Coy merely recommended that RA Swann consider asserting a penalty. We need not decide whether Senior Counsel Coy made the initial determination to assert the penalty.

1.     *If Senior Counsel Coy made the IRS's initial determination to assert the penalty, his determination was approved by his supervisor.*

If Senior Counsel Coy did make the initial determination to assert the penalty, then that initial determination was approved by Associate Area Counsel Famularo, Senior Counsel Coy's immediate supervisor, while Associate Area Counsel Famularo still had discretion as to whether to approve the penalty determination. *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th at 1074; *Kraske*, 161 T.C. at 110–11.

[*57]    2.    *If Senior Counsel Coy did not make the initial determination to assert the penalty, the initial determination was made by RA Swann and approved by his supervisor.*

But if Senior Counsel Coy did not make the initial determination to assert the penalty, then the initial determination to assert the penalty was made later by RA Swann (and approved by RA Swann's immediate supervisor, Acting Group Manager Houston). Acting Group Manager Houston signed the Civil Penalty Approval Form on June 3, 2019. On that date, Acting Group Manager Houston still had discretion as to whether to approve the penalty determination. *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th at 1074; *Kraske*, 161 T.C. at 110–11. Therefore, we conclude that the IRS satisfied section 6751(b)(1).

H&S Investments makes three arguments as to why RA Swann's determination and Acting Group Manager Houston's approval do not satisfy section 6751(b)(1). All are unavailing. First, H&S Investments contends that RA Swann made the initial determination to *not* assert a penalty because RA Swann's RARs, which were sent to AAM in February and April 2019, did not assert a penalty. But section 6751(b)(1) requires only that the initial determination of a penalty be approved by the immediate supervisor of the individual making the penalty determination.

H&S Investments next argues that there is no evidence that RA Swann was the person who completed the Civil Penalty Approval Form determining a penalty should be asserted. H&S Investments contends that Acting Group Manager Houston may have been the one who completed the Civil Penalty Approval Form.

Both RA Swann and Acting Group Manager Houston credibly testified that RA Swann was the person who completed the Civil Penalty Approval Form determining a penalty should be asserted. Furthermore, RA Swann's name appears on the Civil Penalty Approval Form as the "Examiner." This is persuasive evidence that RA Swann completed the Civil Penalty Approval Form.

Finally, H&S Investments argues that there is insufficient evidence that Acting Group Manager Houston was RA Swann's immediate supervisor at the time RA Swann made his penalty determination. We disagree. An "Internal Revenue Service Designation"

[*58] form designates Acting Group Manager Houston as "Acting Group Manager" from March 3 to June 22, 2019. Furthermore, Acting Group Manager Houston credibly testified that she was RA Swann's immediate supervisor when RA Swann made his penalty determination. Therefore, we find that Acting Group Manager Houston was RA Swann's immediate supervisor.

For all the foregoing reasons, we conclude that the IRS has complied with section 6751(b)(1).

B.     *AAM had reasonable cause and acted in good faith because Schulman reasonably relied on the advice of Bolar and Bellew when claiming AAM's bad-debt deduction.*

H&S Investments next argues that AAM had reasonable cause for and acted in good faith in claiming its bad-debt deduction because Schulman reasonably relied on the advice of its accountants, Bolar and Bellew, when claiming the bad-debt deduction on AAM's return. We agree. Both Bolar and Bellew had decades of experience as CPAs and were competent professionals with sufficient expertise to justify Schulman's reliance. *See Neonatology Assocs.*, 115 T.C. at 99. Furthermore, Murphy, on behalf of Schulman and AAM, provided relevant and accurate information related to the advances to Bolar and Bellew. *See id.* Finally, after reviewing the information they received from Murphy, Bellew's memo advised Schulman that AAM could claim the bad-debt deduction on its 2015 return. Murphy, Foltz, and Schulman all credibly testified that AAM would not have claimed the bad-debt deduction without Bolar's and Bellew's advice. We thus hold that Schulman relied in good faith on Bolar's and Bellew's judgment that AAM could claim the bad-debt deduction. *See id.*

The IRS argues that Bolar and Bellew did not give Schulman any advice as to whether the advances were bona fide debts. Thus, the IRS contends, Schulman cannot rely on the opinion of Bolar and Bellew as reasonable cause for claiming the bad-debt deduction. We disagree. Bellew's memo does focus on whether the advances were worthless at the end of 2015. Schulman, Bolar, and Bellew all believed that the close legal question for claiming a bad-debt deduction was whether the advances were worthless in 2015. That is why Bellew's memo addressed the worthlessness issue. But although Bellew's memo focused mainly on the worthlessness issue, Schulman had sought more general advice as to whether the advances were deductible under section 166. Furthermore, Bellew credibly testified that, as part of his analysis, he

**[\*59]** considered whether AAM's advances were debt and concluded that the advances were debt. Bolar and Bellew concluded that the advances were deductible under section 166, and we find that, as part of that conclusion, Bolar and Bellew concluded that the advances were debt.

For all the foregoing reasons, we conclude that AAM had reasonable cause for and acted in good faith in claiming its bad-debt deduction. Therefore, a section 6662(a) penalty is not applicable to AAM's claim of a bad-debt deduction.[25]

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent with respect to the bad-debt deduction and for petitioner with respect to the section 6662(a) penalty.*

---

[25] In addition to arguing that AAM had reasonable cause for and acted in good faith in claiming its bad-debt deduction, H&S Investments makes the following arguments. H&S Investments argues that AAM was not negligent in claiming its bad-debt deduction because AAM had a reasonable basis for claiming the bad-debt deduction. *See* Treas. Reg. § 1.6662-3(b)(1). H&S Investments argues that a section 6662(a) penalty for a substantial understatement of income tax is not applicable to AAM's claim of a bad-debt deduction because AAM (1) had substantial authority for claiming the bad-debt deduction, *see* § 6662(d)(2)(B)(i), and (2) had a reasonable basis for claiming the bad-debt deduction and adequately disclosed the deduction on its return, *see id.* cl. (ii). Because we conclude that AAM had reasonable cause for and acted in good faith in claiming its bad-debt deduction, we need not address H&S Investments' other arguments as to why the section 6662(a) penalty should not apply.